**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD MONTS, derivatively on behalf of RIOT BLOCKCHAIN, INC. F/K/A BIOPTIX, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN R. O'ROURKE, JEFFREY G. MCGONEGAL, ANDREW J. KAPLAN, JASON LES, BARRY C. HONIG, and ERIC SO, <br><br> Defendants, <br><br> and <br><br> RIOT BLOCKCHAIN, INC. F/K/A BIOPTIX, INC., <br><br> Nominal Defendant. | Case No.:  1:18-CV-1443 [MAD/DJS] |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Edward Monts ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Riot Blockchain, Inc. f/k/a Bioptix, Inc. ("Riot" or "the Company"), files this Verified Shareholder Derivative Complaint against Defendants John R. O'Rourke, Jeffrey G. McGonegal, Andrew J. Kaplan, Jason Les, Barry C. Honig, and Eric So (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Riot, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendant Barry C. Honig for aiding and abetting the foregoing. As for his complaint against the Individual Defendants,

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Riot, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Riot's directors and officers beginning on October 4, 2017 and continuing through the present (the "Relevant Period").

2.     Riot purports to leverage its expertise to build and support blockchain technologies and intends to use its technical experience to become a leading supporter of blockchain, while providing investment exposure to the rapidly growing Bitcoin and blockchain ecosystems.

3.     Until October 2017, Riot was formerly known as Bioptix, Inc., which was known for possessing a veterinary products patent and developing new ways to test for disease.

4.     On December 12, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement") indicating that the Company's 2017 Annual Meeting of Shareholders was to be held on December 28, 2017 in Boca Raton, Florida.

5.      On December 27, 2017, the Company issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders[1] was moved to February 1, 2018.

6.      On January 31, 2018, the Company issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was moved for a second time, without announcing a new date and time for its annual meeting.

7.      Also on January 31, 2018, the Company filed a Form 8-K with the SEC announcing that it had received a notification from the NASDAQ Stock Market LLC ("NASDAQ") that the Company had not held its annual meeting of shareholders within twelve months of the end of the Company's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

8.      On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company.

9.      On this news, the price per share of Riot stock at closing fell $5.74, or approximately 33.4%, from the previous day's closing price to close at $11.46 on February 16, 2018.

10.      On April 17, 2018, Riot filed an annual report on Form 10-K with the SEC, disclosing that on April 9, 2018, the Company received a subpoena requesting documents from the SEC.

11.      On this news, the price per share of Riot stock at closing fell $0.34, or approximately 5.9%, from the previous day's closing price to close at $6.87 on April 18, 2018.

---

[1] The Company uses the word "Stockholders" in its press release, but uses the word "Shareholders" in its 2017 Proxy Statement.

12.     The Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls and to waste corporate assets in order to benefit corporate insiders and parties related to corporate insiders.

13.     The Individual Defendants moreover breached their fiduciary duties by failing to hold an annual meeting of stockholders from November 30, 2016 to May 9, 2018, depriving the Company's shareholders of their fundamental rights.

14.     The Individual Defendants, in further breach of their fiduciary duties, engaged in and/or permitted to occur a scheme to artificially inflate the Company's stock through false and misleading statements and in which Defendant Barry C. Honig ("Honig"), along with certain of his associates, accumulated large amounts of Company stock and sold almost all of their shares before the Individual Defendants' misconduct was revealed (the "Pump-and-Dump Scheme").

15.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public during the Relevant Period that failed to disclose that: (1) the Pump-and-Dump Scheme was occurring; (2) Riot in reality had limited meaningful investments in cryptocurrency products; (3) the Company did not have a meaningful cryptocurrency business plan; (4) Defendants John R. O'Rourke ("O'Rourke") and Honig have a history of financial dealings and joining in investments and regularly consulted regarding Riot's business and affairs; (5) the Company's principal executive offices were not in Colorado as stated by the Company, but instead in Florida in the same location as Defendant Honig; (6) Defendant Honig effectively

- 4 -

controlled and/or exercised undue influence over Riot and its operations and affairs; (7) the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (8) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to timely correct these false and misleading statements and omissions of material fact.

17.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Riot, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), an SEC investigation, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, and the Company will have to expend many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, their being beholden to

each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Riot Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal Securities Class Action based on violations of the Exchange Act.

21.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     Article XIV of the Company's Bylaws state:

Unless the Corporation consents in writing to the selection of an alternative forum, a state or federal court located within the State of New York shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders . . . .

Thus, Defendants have consented to jurisdiction in this Court.

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

26.     Plaintiff is a current shareholder of Riot common stock. Plaintiff has continuously held Riot common stock since he purchased it in October 2017. Plaintiff is a citizen of Georgia.

**Nominal Defendant Riot**

27.     Nominal Defendant Riot is a Nevada corporation with its principal executive offices purportedly located at 202 6th Street, Suite 401, Castle Rock, CO 80104.

28.     Riot stock trades on the NASDAQ under the ticker symbol "RIOT."

**Defendant O'Rourke**

29.     Defendant O'Rourke served as the Company's CEO from November 3, 2017 to September 8, 2018, and sat on the Company's Board from January 2017 to September 8, 2018. According to the Company's Schedule 14A filed with the SEC on December 12, 2017 (the "2017 Proxy Statement"), as of December 11, 2017, Defendant O'Rourke beneficially owned 202,555 shares of the Company's common stock, which represented 2.1% of the Company's outstanding stock as of that date.[2] Given that the price per share of the Company's common stock at the close

---

[2] Includes (i) 11,041 shares of common stock, (ii) 7,293 shares of common stock vested or to be vested pursuant to a restricted stock award of an aggregate of 35,000 shares pursuant to the 2002 Stock Incentive Plan (the "2002 Plan") which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of February 3, 2017, (iii) 5,417 shares of common stock vested or to be vested pursuant to a restricted stock award of an aggregate of 30,000 shares pursuant to the 2002 Plan which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of August 21, 2017, (iv) 12,501 shares of common stock vested or to be vested pursuant to a restricted stock award of an aggregate of 75,000 shares pursuant to the 2017 Equity Incentive Plan (the "2017 Plan") which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of September 27,

of trading on December 11, 2017 was $23.08, O'Rourke owned approximately $4.7 million worth

of Riot stock.

     30.     Per the Company's Form 8-K filed with the SEC on November 3, 2017, the Board

approved the following as compensation for Defendant O'Rourke:

> (i) a monthly salary of $25,000, (ii) a restricted stock award of 344,000 shares of
> common stock which shall vest in 24 equal monthly installments beginning one
> month from the date of issuance and (iii) an option to purchase up to 100,000 shares
> of the Company's common stock, at an exercise price $10.00, the exercisability of
> which is subject to shareholder approval of an increase to the amount of shares
> available for issuance under the Company's equity incentive plan.

     31.     The Company's 2017 Proxy Statement stated the following about Defendant

O'Rourke:

> **John R. O'Rourke**[3] has been serving as a Director of the Company since January
> 2017, and has been the Chief Executive Officer since November 2017. Mr.
> O'Rourke is an analyst and investor who serves as Managing Member of ATG
> Capital LLC, an investment fund focused on small and mid-cap growth companies
> possessing distinct competitive advantages and superior management teams. Mr.
> O'Rourke currently serves on the Board of Directors of Mundo Inc., a leading
> global performance based marketing company. He received his Bachelor of
> Science in Accounting with an Honors Citation from the University of Maryland,
> College Park. Mr. O'Rourke is qualified to serve as a director because of his prior
> management experience, deep knowledge of capital markets, experience in public
> company accounting, finance, and audit matters as well as his experience in a range
> of board and committee functions as a member of various boards.

---

2017, (v) 43,003 shares of common stock vested or to be vested pursuant to a restricted stock
award of an aggregate of 344,000 shares pursuant to the 2017 Plan which vest in 24 equal monthly
installments over a two year period, beginning on the one month anniversary of November 3, 2017
and (vi) options currently exercisable or exercisable within 60 days to purchase an aggregate of
100,000 shares of common stock at an exercise price of $10.00 per share pursuant to the 2017
Plan. Also includes an aggregate of 23,300 shares held by ATG Capital LLC, for which Defendant
O'Rourke is the managing member and sole beneficiary and in such capacity holds voting and
dispositive power over the securities held by that entity.

[3] Emphasis in original unless otherwise noted throughout.

32.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant O'Rourke made the following sales of Company stock (and made no purchases of Company stock):

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 29, 2017 | 19,583 | $28.45 | $557,136.35 |
| December 29, 2017 | 10,800 | $28.90 | $312,120.00 |

33.     Thus, in total, before the fraud was exposed, he sold 30,383 Company shares on inside information, for which he received approximately $869,256. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

34.     Defendant O'Rourke is a citizen of Florida.

**Defendant McGonegal**

35.     Defendant Jeffrey G. McGonegal ("McGonegal") was the Company's Chief Financial Officer ("CFO") from 2003 to February 28, 2018, from which point he served solely as the Company's Principal Accounting Officer until April 2018.[4]   According to the 2017 Proxy Statement, as of December 11, 2017, Defendant McGonegal beneficially owned 3,929 shares of the Company's common stock.[5] Given that the price per share of the Company's common stock at

---

[4] After April 30, 2018, Defendant McGonegal shall be engaged by the Company as a consultant for a period of four months, during which time he shall be entitled to all benefits previously provided by the Company, but shall be obligated only to provide such reasonable transition related services and duties as are requested by the CEO, the CFO, and the Board from time to time. To the extent that any litigation in process as of February 28, 2018 continues to be outstanding at the end of such four-month consulting period, the consulting arrangement shall continue month to month until the litigation is no longer outstanding with compensation and benefits payable at a level of 50% of the consulting fee amount.

[5] Includes (i) 1,009 shares of common stock, (ii) 63 shares of common stock held in Defendant McGonegal's IRA and (iii) 2,857 shares of common stock vested or to be vested pursuant to a restricted stock award of an aggregate of 5,000 shares pursuant to the 2017 Plan which vest in 7

the close of trading on December 11, 2017 was $23.08, McGonegal owned approximately $90,700 worth of Riot stock.

36.     For the fiscal year ended December 31, 2016, Defendant McGonegal received $513,625 in compensation from the Company. This included $272,005 in salary, $89,506 in option awards, $136,003 in non-equity incentive plan compensation and $16,111 in all other compensation.

37.     The Company's 2017 Proxy Statement stated the following about Defendant McGonegal:

> **Jeffrey G. McGonegal** became Chief Financial Officer of the Company in June 2003, was appointed Corporate Secretary in January 2010 and served as interim President in December 2004 and January 2005. Mr. McGonegal served from 2003 to January 1, 2011 as Chief Financial Officer of PepperBall Technologies, Inc. Until his resignation in September 2013, Mr. McGonegal served on a limited part-time basis as Senior Vice President — Finance of Cambridge Holdings, Ltd., a small publicly held company with limited business activities. Mr. McGonegal served as Chief Financial Officer of Bactolac Pharmaceutical, Inc. and had been associated with its predecessors through October 2006, a company (publicly held until September 2006) engaged in manufacturing and marketing of vitamins and nutritional supplements. From 1974 to 1997, Mr. McGonegal was an accountant with BDO Seidman LLP. While at BDO Seidman LLP, Mr. McGonegal served as Managing Partner of the Denver, Colorado office. Until his resignation in March 2012, Mr. McGonegal was elected in 2005 to serve on the board of Imagenetix, Inc., a publicly held company in the nutritional supplements industry. He received a B.A. degree in accounting from Florida State University.

38.     Upon information and belief, Defendant McGonegal is a citizen of Colorado.

**Defendant Kaplan**

39.     Defendant Andrew J. Kaplan ("Kaplan") sat on the Company's Board from May 5, 2017 to October 22, 2018.  He served as Chairman of the Nominating and Governance Committee and a member of the Audit Committee and the Compensation Committee. According to the 2017

_____

equal monthly installments, beginning on October 31, 2017.

Proxy Statement, as of December 11, 2017, Defendant Kaplan beneficially owned 6,583 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on December 11, 2017 was $23.08, Kaplan owned over $151,900 worth of Riot stock.

40.    According the Company's Form 8-K filed with the SEC on May 8, 2018, Defendant Kaplan "shall receive the Company's equity award for new independent directors of 12,000 restricted stock units as compensation, which shall vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of the date of issuance."

41.    The Company's 2017 Proxy Statement stated the following about Defendant Kaplan:

> **Andrew J. Kaplan** has been serving as a Director of the Company since May 2017. Mr. Kaplan is a founder of A to B Capital Management, and manages the A to B Capital Special Situations Fund, LP which was launched on January 1, 2009. The fund invests in the small cap sector through private, pre-public and publicly traded companies. In addition, he has been a Vice President of Barry Kaplan Associates for the past 22 years, a leading financial public relations firm for both public and private companies in the US, Canada and abroad. Prior to working at BKA, he had six years' experience working at major investment banks involved in deal structure, mergers and acquisitions and trading. Mr. Kaplan is a member of the Board of Directors of U.S. Gold Corp. (USAU) and Coral Gold Resources, Ltd. (CLH.V) and a former member of the Board of PolarityTE, Inc. (COOL) and Naked Brand Group (NAKD). He holds a BSBA from the University of Hartford in Finance and Insurance. Mr. Kaplan is qualified to serve as a director due to his extensive business and management expertise and his extensive knowledge of capital markets.

---

[6] Includes (i) 2,416 shares of common stock, (ii) 2,500 shares vested or to be vested of common stock pursuant to a restricted stock award of an aggregate of 12,000 shares pursuant to the 2002 Plan which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of May 5, 2017 and (iii) 1,667 shares of common stock vested or to be vested pursuant to a restricted stock award of an aggregate of 10,000 shares pursuant to the 2002 Plan which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of August 21, 2017.

42.     Upon information and belief, Defendant Kaplan is a citizen of New Jersey.

**Defendant Les**

43.     Defendant Jason Les ("Les") has sat on the Company's Board since November 3, 2017, and he is Chairman of the Compensation Committee, interim Chairman of the Audit Committee, and a member of the Nominating and Governance Committee. According to the 2017 Proxy Statement, as of December 11, 2017, Defendant Les beneficially owned 15,937 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on December 11, 2017 was $23.08, Les owned over $367,800 worth of Riot stock.

44.     Per the Company's Form 8-K filed with the SEC on November 3, 2017, Defendant Les "shall receive the Company's equity award for new independent directors of 7,500 restricted stock units as compensation, which shall vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of the date of issuance."

45.     The Company's 2017 Proxy Statement stated the following about Defendant Les:

> **Jason Les** has been serving as a Director of the Company since November 2017 and also serves on the Advisory Board. Mr. Les is an established professional poker player. Mr. Les successfully competed in high stakes heads-up games online for several years and was twice selected as the human benchmark for testing the world's best poker artificial intelligence in what was dubbed Man vs Machine at Carnegie Mellon University.  Mr. Les graduated from U.C. Irvine in 2010 with a B.S. in Information and Computer Science. Mr. Les is qualified as a director based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies.

46.     Upon information and belief, Defendant Les is a citizen of California.

---

[7] Includes (i) 15,000 shares of common stock and (ii) 937 shares of common stock vested or to be vested pursuant to a restricted stock award of an aggregate of 7,500 shares pursuant to the 2017 Plan which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of November 3, 2017.

**Defendant So**

47.     Defendant Eric So ("So") sat on the Company's Board from October 2017 to February 2018 and served as Chairman of the Audit Committee and as a member of the Compensation Committee and the Nominating and Governance Committee. According to the 2017 Proxy Statement, as of December 11, 2017, Defendant So beneficially owned 937 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on December 11, 2017 was $23.08, So owned over $21,600 worth of Riot stock.

48.     Pursuant to the Company's Form 8-K filed with the SEC on October 23, 2017, Defendant So "shall receive the Company's equity award for new independent directors of 7,500 restricted stock units as compensation, which shall vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of the date of issuance."

49.     The Company's 2017 Proxy Statement stated the following about Defendant So:

> **Eric So** has been a Director of the Company since October 2017. Mr. So is currently Chief Legal and Corporate Development Officer at Mundo Inc., a private internet marketing company, and serves as a Director of Therapix Biosciences Ltd. (NASDAQ:TRPX).  He is also a member of the Toronto Board of Trade and the Hong Kong Canada Business Association. Mr. So has previously worked at Synergex Corporation, Fraser Milner Casgrain LLP, and Torys LLP. He earned his law degree at the University of Windsor and his bachelor of science at McGill University. Mr. So is qualified to serve as a director due to his extensive business and legal expertise.

50.     Upon information and belief, Defendant So is a citizen of Canada.

---

[8] Includes 937 shares vested or to be vested of common stock pursuant to a restricted stock award of an aggregate of 7,500 shares pursuant to the 2017 Plan which vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of October 20, 2017.

**Defendant Honig**

51.     Defendant Honig is large, influential stockholder of the Company who has a history of business dealings with Defendant O'Rourke.  Per the Company's periodic reports filed with the SEC in 2018, Defendant Honig (with other group members) beneficially owned at one point greater than 10% of the dispositive and voting power of Riot's common stock.

52.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Honig made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 4, 2017 | 47,520 | $8.92 | $423,878.40 |
| December 5, 2017 | 11,400 | $7.47 | $85,158.00 |
| October 6, 2017 | 10,000 | $7.29 | $72,900.00 |
| October 9, 2017 | 136,028 | $8.62 | $1,172,561.36 |
| October 10, 2017 | 55,459 | $9.32 | $516,877.88 |
| October 10, 2017 | 11,070 | $8.43 | $93,320.10 |
| October 11, 2017 | 130,000 | $10.10 | $1,313,000.00 |
| October 11, 2017 | 128,916 | $10.00 | $1,289,160.00 |
| October 11, 2017 | 35,000 | $10.00 | $350,000.00 |
| October 12, 2017 | 26,600 | $8.25 | $219,450.00 |
| October 12, 2017 | 15,000 | $8.44 | $126,600.00 |
| October 17, 2017 | 4,000 | $8.47 | $33,880.00 |
| October 18, 2017 | 3,088 | $7.68 | $23,715.84 |
| October 19, 2017 | 3,700 | $8.17 | $30,229.00 |
| October 20, 2017 | 45,000 | $8.20 | $369,000.00 |
| November 7, 2017 | 3,800 | $8.42 | $31,996.00 |
| November 9, 2017 | 800 | $7.75 | $6,200.00 |
| November 10, 2017 | 3,972 | $7.25 | $28,797.00 |
| November 13, 2017 | 9,500 | $7.25 | $68,875.00 |
| November 14, 2017 | 1,032 | $7.20 | $7,430.40 |
| November 14, 2017 | 3,968 | $7.10 | $28,172.80 |
| November 15, 2017 | 5,268 | $7.64 | $40,247.52 |
| November 16, 2017 | 61,000 | $8.31 | $506,910.00 |
| November 17, 2017 | 18,588 | $8.81 | $163,760.28 |

| November 20, 2017 | 262,293 | $10.48 | $2,748,830.64 |
| November 21, 2017 | 143,475 | $12.85 | $1,843,653.75 |
| November 24, 2017 | 10,000 | $11.77 | $117,700.00 |
| November 24, 2017 | 64,235 | $11.77 | $756,045.95 |
| November 24, 2017 | 64,235 | $11.77 | $756,045.95 |
| November 24, 2017 | 64,235 | $11.77 | $756,045.95 |
| November 24, 2017 | 64,236 | $14.19 | $911,508.84 |
| November 28, 2017 | 27,907 | $16.61 | $463,535.27 |
| November 28, 2017 | 1,500 | $16.64 | $24,960.00 |
| November 28, 2017 | 58,593 | $16.64 | $974,987.52 |
| November 29, 2017 | 36,587 | $16.94 | $619,783.78 |
| November 29, 2017 | 9,248 | $13.29 | $122,905.92 |
| November 30, 2017 | 5,752 | $13.13 | $75,523.76 |

53.     Thus, in total, before the fraud was exposed, he sold 1,583,005 Company shares on inside information, for which he received over $17.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

54.     Defendant Honig is a citizen of Florida.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

55.     By reason of their positions as officers, directors and/or fiduciaries of Riot and because of their ability to control the business and corporate affairs of Riot, the Individual Defendants owed Riot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Riot in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Riot and its shareholders so as to benefit all shareholders equally.

- 15 -

56.    Each director and officer of the Company owes to Riot and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Riot, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Riot, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Riot's Board at all relevant times.

59.    As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60.     To discharge their duties, the officers and directors of Riot were required to exercise reasonable and prudent supervision over the management, policies, practices, operations, and internal controls of the Company. By virtue of such duties, the officers and directors of Riot were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the United States, the State of Nevada, and pursuant to Riot's own Code of Ethics and Business Conduct and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Riot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Riot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Riot's operations would comply with all laws and Riot's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.     Each of the Individual Defendants further owed to Riot and the shareholders the duty of loyalty requiring that each favor Riot's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Riot and were at all times acting within the course and scope of such agency.

63.     Because of their advisory, executive, managerial, and directorial positions with Riot, each of the Individual Defendants had access to adverse, non-public information about the Company.

64.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Riot.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

66.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

67.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, fail to maintain adequate internal controls, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority and approval of the Board, each of the Individual Defendants who are directors of Riot was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Riot, and was at all times acting within the course and scope of such agency.

## RIOT'S CODE OF ETHICS AND BUISNESS CONDUCT

70.     The Company's Code of Ethics and Business Conduct (the "Code of Conduct"), provides that "[t]he business of Riot Blockchain, Inc. . . . shall be conducted with honesty and integrity and in accordance with the highest ethical and legal standards," and the Code of Conduct was adopted to provide written standards and guidance to the Company's directors, officers and employees (collectively, "*Covered Persons*") to promote:

> • Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
> • Compliance with applicable governmental laws, rules and regulations;
> • Full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;
> • The prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and
> • Accountability for adherence to the Code.

71.     The Code of Conduct provides, as to "Compliance with law," that:

> The Company and all Covered Persons should respect and comply with all of the applicable laws, rules and regulations of the United States and the other countries and state, local and other jurisdictions in which the Company conducts its business or in which the Company's stock is traded . . . All Covered Persons should understand those laws that apply to them in the performance of their jobs and take steps to ensure that the parts of the Company's operations with which they are involved are conducted in conformity with those laws. The failure of Covered

Persons to adhere to the letter and the spirit of the law could result in both personal and corporate civil or criminal liability. Each Covered Person is personally responsible for complying with the law.

72.     The Code of Conduct provides, as to "Fair Dealing," that:

Each Covered Person should endeavor to deal fairly with the Company's employees, officers, directors, customers, suppliers and competitors. No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.

73.     The Code of Conduct provides, as to "Public Reporting," that:

As a public company, it is of critical importance that the Company's public disclosures, including filings with the Securities and Exchange Commission, be accurate and timely. A Covered Person may be called upon to provide necessary information to assure that the Company's public disclosures are complete, fair and understandable. The Company expects Covered Persons to take this responsibility very seriously and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

In addition, each Covered Person must promptly bring to the attention of his or her supervisor or the Compliance Officer any information that the Covered Person may have concerning (i) significant deficiencies in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management, directors, or other Covered Persons.

74.     The Code of Conduct provides, as to "Compliance with this Code," that:

Covered Persons are expected to comply with all of the provisions of this Code. Each Covered Person has an obligation to promptly notify the Compliance Officer in writing of any situation that may involve violation of this Code. The Company will not allow retaliation for reports of potential violations that are made in good faith.

75.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## RIOT'S INSIDER TRADING POLICY

76.     In addition to the Code of Conduct, Riot has a separate Insider Trading Policy which "applies to purchases, sales, hedges, shorts, or any other direct or indirect (a 'Transaction') in the Company's securities including common stock, options for common stock and any other securities issued by the Company." The "Policy applies to directors, officers, employees, consultants, and contractors of the Company and its subsidiaries" who are privy to material inside information about the Company.

77.     The Insider Trading Policy states that "information should be regarded as material if there is a reasonable likelihood that it would be considered important to an investor considering completing a Transaction in the Company's securities."

78.     The Insider Trading Policy provides, as to "Trading on Material Inside Information," that "[a]n Insider shall not engage in any Transaction while in possession of Inside Information."

79.     The Insider Trading Policy contains a "Black-out Period" "during which directors, executive officers, direct reports of directors and executive officers, and all employees of the

finance department are prohibited from completing any Transactions." The quarterly Black-out

Period provides that:

> **The trading window is closed beginning at 9 a.m. on the calendar day that is two (2) days before the end of each calendar quarter and reopens at 9 a.m. on the first (1st) calendar day after the Company filed the required SEC reports for that applicable quarter**.

* * *

> Even when the Trading Window is open, any person possessing Inside Information concerning the Company should not engage in any Transactions until such information has been known publicly for at least two Trading Days, whether or not the Company has recommended a suspension of trading to that person. Transactions in the Company's securities when the Trading Window is "open" should not be considered a "safe harbor," and all directors, executive officers and other persons should use good judgment at all times.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Pump-and-Dump Scheme

80. Prior to becoming Riot, the Company was operating under the name Bioptix, Inc. ("Bioptix"), holding a veterinary products patent and focusing on developing new ways to test for disease.

81. In October 2017, the Company changed its name to Riot Blockchain, Inc. and pivoted its business model to focus on blockchain technology, which powers the seemingly-omnipresent Bitcoin, as well as other cryptocurrencies such as Ethereum and Litecoin.

82. The Company had no prior experience with blockchain prior to the October 2017 pivot.

83. Riot's name change from Bioptix, Inc. was an element of a scheme engaged in and/or permitted by the Individual Defendants to capitalize on market and public interest in

cryptocurrency and cryptocurrency products, which resulted in the artificial inflation of the price of Riot stock and unjust enrichment of Company insiders.

84.     In reality, Riot lacked a meaningful business plan for its cryptocurrency venture, the fundamental business or expertise of a true blockchain company, the requisite infrastructure, and the significant asset exposure to the cryptocurrency markets.  The scheme was perpetuated by Defendant Honig and certain investors who effectively controlled and exercised undue influence over the Company's operations and affairs through Defendant Honig's offices in Florida.

85.     In April 2016, Defendant Honig, through his investment firm GRQ Consultants, Inc., purchased over 335,000 shares of Riot, which was then operating as Venaxis, Inc. ("Venaxis").  In September 2016, Venaxis acquired Bioptix, and renamed the Company Bioptix, Inc.

86.     By December 2016, Defendant Honig had at least 500,000 shares of Company stock, which made him the Company's biggest shareholder.  Using his shares, he nominated a slate of directors, including Defendant O'Rourke, to the Board.  Defendant Honig's slate of nominees was opposed by Company insiders at the outset, so Honig initiated legal action in Colorado state court to force the Company to hold a special meeting of shareholders for the purpose of replacing certain Board members with his nominees.

87.     The directors Defendant Honig sought to remove resigned, noting in a resignation letter that principal shareholders of Riot indicated to them that if a special meeting were to be held, Honig's proposals would be approved by shareholders.  Subsequently, Defendant O'Rourke and Mike Dai were appointed to the Board, and additional directors not chosen by Honig resigned. The Company's CEO at the time, Stephen Lundy, also resigned.

88.     By August 21, 2017, Honig's investment firm GRQ Consultants, Inc., owned 30,600 Company shares—roughly 10% of the Company's stock.  His father, Alan Honig, owned 20,000 shares of Company stock and an investment fund owned by his brother, Jonathan Honig, owned an additionally 10% of the Company's stock.  Moreover, a reported business associate of Defendant Honig, Mark Groussman, indirectly owned 500,000 shares of Company stock.

89.     Per the Company's periodic reports filed with the SEC in 2018, Defendant Honig (with other group members) beneficially owned greater than 10% of the dispositive and voting power of Riot's common stock.

90.     By February 13, 2018, Defendant Honig reported that he beneficially owned 173,432 shares of Riot stock, representing less than 1.5% of Riot's outstanding shares as of January 4, 2018.  Jonathan Honig and Mark Groussman also reported within the next two days that their share ownerships had decreased to 201,000 and 189,000 shares, respectively.  These three individuals each sold around the time Riot's share price was near an all-time high and reported their respective ownerships just days before the truth emerged on February 16, 2018.

91.     Defendant Honig and his affiliates, after the Individual Defendants pumped up the price of the Company's stock through the false and misleading statements detailed below, dumped almost all of their shares before the truth about the Company emerged.  The Individual Defendants, in breach of their fiduciary duties, caused these false and misleading statements to be made, and also caused and/or permitted the Pump-and-Dump Scheme to occur.

**Improper Payment of Special Dividend**

92.     On October 3, 2017, the Company, still operating under the name Bioptix, Inc., announced a special cash dividend of approximately $1.00 per share to be paid to Bioptix's

shareholders.  As of September 30, 2017, the Company had an accumulated deficit of over $120 million, and cash and cash equivalents of approximately $13 million with no significant revenue sources.  Thus, Defendant Honig and his affiliates improperly were awarded millions of dollars collectively that damaged further the Company's diminishing cash reserves and its ability to pursue business opportunities.

93.     The total of the cash dividend, paid on October 18, 2017, was approximately $9.6 million.

**Failure to Timely Hold an Annual Meeting**

94.     In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to timely hold an annual meeting, depriving shareholders of fundamental rights.

95.     On December 12, 2017, the Company filed the 2017 Proxy Statement, indicating that the Company's 2017 Annual Meeting of Shareholders was to be held on December 28, 2017 in Boca Raton, Florida.

96.     On December 27, 2017, the Company issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was moved to February 1, 2018.

97.     On January 31, 2018, the Company issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was moved for a second time, without announcing a new date and time for its annual meeting.

98.     Also on January 31, 2018, the Company filed a Form 8-K with the SEC announcing that it had received a notification from the NASDAQ that the Company had not held its annual meeting of shareholders within twelve months of the end of the Company's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

99.     On May 9, 2018, the Company held its previously scheduled 2017 Annual Meeting of Shareholders.  In the Company's Form 8-K filed with the SEC on May 15, 2018 which discussed the annual meeting, the Company stated that "[n]o actions were taken with respect to any of the proposals submitted for approval.  At the meeting, the Company stated that each of the matters would be considered subsequently at the 2018 annual meting of shareholders" and that a new proxy statement for the 2018 annual meeting would be filed with the SEC, meaning that the Company effectively bypassed holding an annual meeting for 2017.

100.     On June 15, 2018, the Company held its Annual Meeting of Shareholders, electing Remo Mancini and Defendants O'Rourke, Kaplan, and Les to the Board, appointing MNP LLP as the Company's independent registered public accounting firm, and approving, on an advisory basis, executive compensation.

101.     Thus, from November 30, 2016 to effectively June 15, 2018, the Individual Defendants caused the Company to fail to properly schedule and hold its Annual Meeting of Shareholders, thus breaching their fiduciary duties and depriving shareholders of their fundamental rights.   The Individual Defendants failure to hold an annual stockholders' meeting could not be a decision that was based on legitimate business judgment and, moreover, reflects their decision to entrench the members of the Board by not letting Riot's shareholders vote for others to become directors in their stead.

**False and Misleading Statements**

***October 4, 2017 Press Release***

102.     On October 4, 2017, Riot issued a press release, titled "Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain

Technologies."   The press release commented on the name change and directional shift of the

Company, stating, in relevant part:

> CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.
>
> As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.
>
> "At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

### October 5, 2017 Investor Presentation

103.    On October 5, 2017, the Company filed a Form 8-K with an attached "Investor

Presentation" with the SEC.  The Investor Presentation described the Company's as being "part of

the disruptive technology and activities revolutionizing transactions and noted a $150 billion

market opportunities for companies seeking to invest in blockchain technologies.  The Investor

Presentation moreover described Riot as a "first mover" as a "NASDAQ listed pure play

Blockchain company."   The Investor Presentation also stated, "At Riot Blockchain Inc. we

leverage our expertise, and network, to build and support blockchain technology companies.  We

provide investment exposure to the rapidly growing blockchain ecosystem."

### October 17, 2017 Press Release

- 28 -

104.    On October 17, 2017, the Company issued a press release announcing that it was to acquire a majority interest in TESS Inc., a blockchain development company.  The press release provided commentary on the acquisition, stating, in relevant part:

> "Riot Blockchain is committed to building and supporting the blockchain ecosystem," said Michael Beeghley, CEO of Riot Blockchain. "The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries. I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives."

### October 27, 2017 Investor Presentation

105.    On October 27, 2017, the Company filed with the SEC a Form 8-K with an updated Investor Presentation attached.  The updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017"—a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor Presentation.   In addition to providing information concerning the Company's business acquisitions, the updated Investor Presentation also stated that the Company would provide "a gateway to blockchain" as "one of the only Nasdaq listed companies with this focus."

### November 2, 2017 Press Release

106.    On November 2, 2017, the Company issued a press release announcing that it entered into an agreement for the acquisition of 1,200 Bitcoin mining equipment.  In the press release, Defendant O'Rourke stated:

> The acquisition positions us to launch our cryptocurrency mining operations, at a time that Bitcoin and other digital currencies are gaining increased attention and adoption . . . . We plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies.  Mining bitcoin helps secure the bitcoin blockchain, while providing us direct exposure to accumulating bitcoin in the process.

*The 2017 Q3 10-Q*

107.    On November 13, 2017, the Company filed a quarterly report for the quarter ended September 30, 2017 on Form 10-Q with the SEC (the "2017 Q3 10-Q"). The 2017 Q3 10-Q was signed by Defendants O'Rourke and McGonegal.  The 2017 Q3 10-Q stated that by purchasing Riot securities, cryptocurrency holders "realized exponential value" and could "lock in" that price appreciation.  The 2017 Q3 10-Q stated, under "Risk Factors":

> *The price of the Company's shares could be subject to wide price swings since the value of cryptocurrencies may be subject to pricing risk and have historically been subject to wide swings in value.*
>
> The Company's shares are subject to arbitrary pricing factors that are not necessarily associated with traditional factors that influence stock prices or the value of non-cryptocurrency assets such as revenue, cashflows, profitability, growth prospects or business activity levels since the value and price, as determined by the investing public, may be influenced by future anticipated adoption or appreciation in value of cryptocurrencies or the blockchain generally, factors over which the Company has little or no influence or control. The Company's share prices may also be subject to pricing volatility due to supply and demand factors associated with few or limited public company options for investment in the segment, which may benefit the Company in the near term and change over time.
>
> Cryptocurrency market prices are determined primarily using data from various exchanges, over-the-counter markets, and derivative platforms. Furthermore, such prices may be subject to factors such as those that impact commodities, more so than business activities, which could be subjected to additional influence from fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of cryptocurrencies, or the Company or its share price, inflating and making their market prices more volatile or creating "bubble" type risks.
>
> In addition, the success of the Company, the Company's share price, and the interest in investors and the public in the Company as an early entrant into the blockchain and cryptocurrency ecosystem may in large part be the result of the Company's early emergence as a publicly traded company in which holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company, which could be perceived as a way to maintaining investing exposure to the blockchain and cryptocurrency markets

without exposing the investor to the risk in a particular cryptocurrency. Cryptocurrency holders have realized exponential value due to large increases in the prices of cryptocurrencies and may seek to lock in cryptocurrency appreciation, which investing in the Company's securities may be perceived as a way to achieve that result, but may l not continue in the future.  As a result, the value of the Company's securities, and the value of cryptocurrencies generally may be more likely to fluctuate due to changing investor confidence in future appreciation (or depreciation) in market prices, profits from related or unrelated investments or holdings of cryptocurrency.   Such factors or events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, or on the price of the Company's securities, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

108.    The 2017 Q3 10-Q commented on the Company's "Evaluation of Disclosure Controls and Procedures," stating, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of September 30, 2017.

**Changes in Internal Control Over Financial Reporting**

There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

109.    The 2017 Q3 10-Q moreover stated that the Company's principal executive offices were located at 202 6th Street, Suite 401, Castle Rock, CO 80104.

110.    The 2017 Q3 10-Q also stated that the Company had emerged as a company in which "holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company, which could be perceived as a way to

maintaining investing exposure to the blockchain and cryptocurrency markets without exposing the investor to the risk in a particular cryptocurrency."

111.     Attached to the 2017 Q3 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the SOX, signed by Defendants O'Rourke and McGonegal, attesting to the accuracy of the 2017 Q3 10-Q.

*November 15, 2017 Press Release*

112.     On November 15, 2017, the Company issued a press release highlighting Defendant O'Rourke's participation in segments on ZDNet's Tech Republic and providing links to interviews wherein Defendant O'Rourke was described as blockchain technology expert.  During an interview titled "Blockchain 101," Defendant O'Rourke stated, "The blockchain technology itself has potentially infinite uses and use cases" that can potentially disrupt segments of the economy.

*November 16, 2017 Press Release*

113.     On November 16, 2017, the Company issued a press release announcing that it made a strategic investment in Verady, LLC, a company providing accounting, audit, and verification for blockchain based assets.  In the press release, Defendant O'Rourke stated, "With recent highs in Bitcoin and other cryptocurrency valuations, there is significant market potential for blockchain and digital asset technologies.  We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations."

*2017 Proxy Statement*

114.   On December 12, 2017, the Company issued the 2017 Proxy Statement.[9]
Defendants O'Rourke, Kaplan, So, and Les solicited the 2017 Proxy Statement filed pursuant to
Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

115.   The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> ***Our Code of Conduct*** (the "Code"), which was amended and restated as of October
> 2017, ***applies to the Company's employees, directors, officers, contractors,
> consultants, and persons performing similar functions*** ("Covered Persons"). ***This
> includes our CEO and Chairman, our CFO, and our controller/treasurer. We
> require that they avoid conflicts of interest, comply with applicable laws, protect
> Company assets, and conduct business in an ethical and responsible manner and
> in accordance with the Code***. The Code prohibits employees from taking unfair
> advantage of our business partners, competitors, and employees through
> manipulation, concealment, misuse of confidential or privileged information,
> misrepresentation of material facts, or any other practice of unfair dealing or
> improper use of information. The Code requires employees to comply with all
> applicable laws, rules, and regulations wherever in the world we conduct business.
> This includes applicable laws on privacy and data protection, anti-corruption and
> anti-bribery, and trade sanctions. Our Code was amended and restated in October
> 2017 to better reflect our expanding global operations and diverse employee base,
> enhance its clarity and general readability, and to make other stylistic changes to
> more closely align the Code with our overall brand. Our Code is publicly available
> and can be found on our website at www.riotblockchain.com by following the link
> to "Investors" and then to "Governance."

---

[9] As alleged above, the Annual Meeting of Shareholders was postponed on December 27, 2017.
The Company subsequently filed a proxy statement on March 26, 2018 (the "March 2018 Proxy
Statement") for an Annual Meeting of Shareholders to be held on May 9, 2018. A meeting was
held on that date, but no actions were taken with respect to any of the proposals submitted for
approval. Another proxy statement was issued on May 14, 2018 (the "May 2018 Proxy Statement")
for an Annual Meeting of Shareholders to be held on June 15, 2018. That meeting was ultimately
held, and proposals voted on. The March 2018 Proxy Statement and May 2018 Proxy Statement
contained the same statements regarding the Company's Code of Conduct, and failed to disclose
the same facts, as the 2017 Proxy Statement.

[10] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are
based solely on negligence; they are not based on any allegation of reckless or knowing conduct
by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.
Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to
any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

(Emphasis added.)

116.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as multiple Individual Defendants engaged in the Pump-and-Dump Scheme and allowed false and misleading statements to be issued to the investing public, and two of the Individual Defendants engaged in insider trading during the Relevant Period for combined proceeds of over $18 million.

117.    The 2017 Proxy Statement also failed to disclose that: (1) the Pump-and-Dump Scheme was occurring; (2) Riot in reality had limited meaningful investments in cryptocurrency products; (3) the Company did not have a meaningful cryptocurrency business plan; (4) Defendants O'Rourke and Honig have a history of financial dealings and joining in investments and regularly consulted regarding Riot's business and affairs; (5) the Company's principal executive offices were not in Colorado as stated by the Company, but instead in Florida in the same location as Defendant Honig; (6) Defendant Honig effectively controlled and/or exercised undue influence over Riot and its operations and affairs; (7) the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017; and (8) the Company failed to maintain internal controls.

### December 21, 2017 Press Release

118.    On December 27, 2017, the Company issued a press release announcing the Defendant Les was featured in an interview regarding cryptocurrency with ABC7 News in San Francisco.  The press release contained a link to the interview, which noted the increase in the price of Bitcoin from $1,000 to $19,000 during the year and noted Riot as a company specializing in blockchain technology.  During the interview, Defendant Les stated that as a currency, "Bitcoin is gaining adoption rapidly now" and has as its ultimate goal the replacement of the U.S. dollar.

Defendant Les also stated, in response to a question about whether investors should invest in cryptocurrency, that "if they think that's something valuable then yeah they should invest some money, what they're comfortable with, and see what happens, it has seen meteoric rises."

### December 27, 2017 Press Release

119.    On December 27, 2017, the Company issued a press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders." The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had been cancelled. The release stated, in relevant part:

> Riot Blockchain, Inc. (Nasdaq: RIOT) (the "Company") today announced that its 2017 Annual Meeting of Stockholders scheduled for December 28, 2017 (the "Annual Meeting"), was adjourned to achieve a quorum on the proposals to be approved.
>
> The Annual Meeting has been adjourned to 10:00 a.m. Eastern Standard Time on Thursday, February 1, 2018, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL 33422, to allow additional time for the Company's stockholders to vote on proposals to approve the following:
>
> 1.  To elect as directors the nominees named in the proxy statement;
>
> 2.  To ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017;
>
> 3.  To advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay); and
>
> 4.  To approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares.
>
> During the period of the adjournment, the Company will continue to solicit proxies from its stockholders with respect to the proposals set forth in the proxy statement. Only stockholders of record on the record date of December 11, 2017, are entitled to and are being requested to vote. If a stockholder has previously submitted its proxy card and does not wish to change its vote, no further action is required by such stockholder.

### January 5, 2018 Form 8-K

120.   On January 5, 2018, Riot filed a current report on Form 8-K announcing that the company had dismissed EisnerAmper LLP as its independent auditor.

### January 9, 2018 Seeking Alpha Article

121.   On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss."   The article highlighted the dismissal of the Company's auditor, noting that the Company's had three different auditors over the course of a year.

### January 31, 2018 Press Release

122.   On January 31, 2018 the Company issued a second press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders." The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had again been cancelled. The release stated, in relevant part:

> Riot Blockchain, Inc. (Nasdaq: RIOT) (the "Company") today announced that its 2017 Annual Meeting of Stockholders (the "Annual Meeting") was adjourned for a second time to achieve a quorum on the proposals to be approved. Under Nevada law, a new record date is required to be set.
>
> The Company will file and mail a new proxy statement to its shareholders of record as soon as practical after its Board of Directors approves the new record date and schedules a new date and time for its Annual Meeting.

123.   The statements contained or referenced in ¶¶ 102-113 and 118-112 herein were materially false and misleading at the time that they were made and failed to disclose that: (1) the Pump-and-Dump Scheme was occurring; (2) Riot in reality had limited meaningful investments in cryptocurrency products; (3) the Company did not have a meaningful cryptocurrency business plan; (4) Defendants O'Rourke and Honig have a history of financial dealings and joining in

investments and regularly consulted regarding Riot's business and affairs; (5) the Company's principal executive offices were not in Colorado as stated by the Company, but instead in Florida in the same location as Defendant Honig; (6) Defendant Honig effectively controlled and/or exercised undue influence over Riot and its operations and affairs; (7) the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (8) the Company failed to maintain internal controls.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

124.   On February 16, 2018, CNBC published an article about Riot, titled "CNBC Investigates Public Company that Changed Name to Riot Blockchain and Saw its Shares Rocket," which explored a number of questionable business practices and potential issues at the Company. The article provided some background on the Company and noted negative attention it was receiving from the SEC, stating, in relevant part:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> "Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

125.   The article also noted additional questionable moves by the Company surrounding

its 2017 Annual Meeting of Shareholders, stating, in relevant part:

126.   That purchase and the company's name change aren't Riot's only questionable

moves.

A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.

\* \* \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.

127.   The article moreover noted Honig's potential involvement with the Company,

stating, in relevant part:

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

128.    Additional questionable factors relating to the offices of Honig were discussed in

the article, which stated, in relevant part:

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing. He told the crew he was there for a meeting with Honig and that we had just missed him.

129.    The article also noted questionable behavior by Defendant O'Rourke, stating, in

relevant part:

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late

the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."

"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office ... at one time John O'Rourke had space in my office ... we speak often."

Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.

"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.

130.    The article further discusses the relationship between Defendant O'Rourke and

Honig, stating, in relevant part:

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

- 40 -

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

131.    Honig's relationship with the Company is further discussed in the article, which

states, in relevant part:

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

132.    The article also discusses Honig's holdings in the Company, stating, in relevant

part:

But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.

What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.

He declined to further clarify what happened to them.

- 41 -

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. ... I'm not going to talk about my personal trading history or my bank account."

Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.

* * *

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

133.    The article then discusses the Company's more recent moves, stating, in relevant

part:

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

134.    The article also noted that Riot was not Honig's and Defendant O'Rourke's first

cryptocurrency investment, stating, in relevant part:

Riot is not O'Rourke and Honig's first cryptocurrency investment.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

135.     As the article notes, questions remain for Riot:

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

Honig would not disclose how much he made on his investment in Riot, "I wasn't fortunate enough to do as well as you might think and people might speculate. ... I don't regret anything."

136.     On this news, the price per share of Riot stock dropped $5.74, or approximately

33.4%, from the previous day's closing price to close at $11.46 on February 16, 2018.

*April 17, 2018 Form 10-K*

137.    On April 17, 2018, Riot filed an annual report on Form 10-K with the SEC, disclosing that on April 9, 2018, the Company received a subpoena requesting documents from the SEC.

138.    On this news, the price per share of Riot stock at closing fell $0.34, or approximately 5.9%, from the previous day's closing price to close at $6.87 on April 18, 2018.

### *May 17, 2018 Form 10-Q*

139.    On May 17, 2018, the Company filed a quarterly report on Form 10-Q with the SEC providing additional information on the SEC investigation, and stating, in relevant part:

> On April 9, 2018, the Company received a subpoena requesting documents from the U.S. Securities and Exchange Commission pursuant to a formal order of investigation.

> As part of its ongoing review of the Company's SEC filings, the Company has received and responded to comments from the staff of the SEC regarding certain developments and the Company's ongoing development of a blockchain/cryptocurrency business model.  These inquires include the proper asset classification, applicability of the Investment Company Act or 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency. The resolution of these matters is ongoing . . . .

### *September 7, 2018 SEC Action Naming Honig and O'Rourke as Defendants*

140.    On September 7, 2018, the SEC instituted an action against ten individuals and entities they were associated with, including Defendants Honig and O'Rourke, alleging that they engaged in pump-and-dump schemes with multiple companies.  The complaint filed in the action specifically alleges that Defendants Honig and O'Rourke engaged in at least three pump-and-dump schemes, which mirrored the Pump-and-Dump Scheme perpetrated at Riot.  The SEC's action specifically notes that Defendant Honig "was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."

141.   On this news, the price per share of Riot stock dropped $1.38, or approximately 24.3%, from the previous day's closing price to close at $4.30 on September 7, 2018.

## DAMAGES TO RIOT

142.   As a direct and proximate result of the Individual Defendants' conduct, Riot will lose and expend many millions of dollars.

143.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144.   Such expenditures include, but are not limited to, those associated with any internal investigation into the misconduct alleged herein.

145.   Such expenditures include, but are not limited, those associated with the SEC's investigation into the Company.

146.   Such costs include, but are not limited to, compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

147.   Such losses include corporate assets wasted in order to benefit corporate insiders and parties related to corporate insiders, including the Company's improper dividend approved and paid in October 2017.

148.   Such losses also include losses of revenues caused by customers' loss of trust in the Company's business and products and losses incurred caused by mismanagement of the Company due to the failure to maintain internal controls.

149.   As a direct and proximate result of the Individual Defendants' conduct, Riot has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

150.    Plaintiff brings this action derivatively and for the benefit of Riot to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Riot, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

151.    Riot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

152.    Plaintiff is, and has been at all relevant times, a Riot shareholder. Plaintiff will adequately and fairly represent the interests of Riot in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

153.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

154.    A pre-suit demand on the Board of Riot is futile and, therefore, excused. At the time of filing this action, the Board consists of three individuals: Defendant Les and non-parties Remo Mancini and Benjamin Yi (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to two of the three Directors who were on the Board at the time this action was commenced.

155.    Demand is excused as to Defendant Les because he faces a substantial likelihood of liability as a result of the scheme he engaged in knowingly or recklessly to cause the Company

to fail to maintain internal controls, fail to timely hold an annual meeting of shareholders, to waste corporate assets, and to make and/or cause the Company to make false and misleading statements and omissions of material facts—and to fail to correct such misrepresentations, which renders him unable to impartially investigate the charges and decide whether to pursue action against himself and the other perpetrators of the scheme.

156.    In complete abdication of his fiduciary duties, Defendant Les either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, Defendant Les breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and demand upon him is futile, and thus excused.

157.    Additional reasons that demand on Defendant Les is futile follow. Defendant Les has served on the Company's Board since November 2017 and is Chairman of the Compensation Committee, interim Chairman of the Audit Committee, and a member of the Nominating and Governance Committee.  His large Company stock holding, worth over $367,800 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, to waste corporate assets, and to fail to hold an annual meeting of shareholders, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  For these reasons, Defendant Les breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on the Board is futile follow.

159.    Demand in this case is excused because the Directors control the Company and are beholden to each other.  The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Defendant Les from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

160.    Riot has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Riot any part of the damages Riot suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

161.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, Defendant Les cannot claim exculpation from his violations of duty pursuant to the Company's charter (to the extent such a provision exists). As Defendant Les faces a substantial likelihood of liability, he is self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

162.    The acts complained of herein constitute violations of fiduciary duties owed by Riot's officers and directors, and these acts are incapable of ratification.

163.    Defendant Les may also be protected against personal liability for his acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if the Board caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Riot. If there is a directors' and officers' liability insurance policy covering Defendant Les, it may contain provisions that eliminate coverage for any action brought directly by the Company against Les, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue Defendant Les or certain of the officers of Riot, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

164.    If there is no directors' and officers' liability insurance, then the Directors will not cause Riot to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

165.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Individual Defendants for Violations of**
**Section 14(a) of the Securities Exchange Act of 1934**

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

168.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

169.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

170.    Under the direction and watch of the Individual Defendants, the 2017 Proxy Statement failed to disclose that: (1) the Pump-and-Dump Scheme was occurring; (2) Riot in reality had limited meaningful investments in cryptocurrency products; (3) the Company did not have a meaningful cryptocurrency business plan; (4) Defendants O'Rourke and Honig have a history of financial dealings and joining in investments and regularly consulted regarding Riot's business and affairs; (5) the Company's principal executive offices were not in Colorado as stated by the Company, but instead in Florida in the same location as Defendant Honig; (6) Defendant Honig effectively controlled and/or exercised undue influence over Riot and its operations and affairs; (7) the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017; and (8) the Company failed to maintain internal controls.

171.    Moreover, the 2018 Proxy Statement was false and misleading when it discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, including by engaging in the Pump-and-Dump Scheme and causing the Company to issue false and misleading statements, as alleged herein, and two of the Individual Defendants engaging in insider sales of Company stock during the Relevant Period.

172.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including, but not limited to, election of a director and ratification of the selection of an independent auditor.

173.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

174.    Plaintiff on behalf of Riot has no adequate remedy at law.

**SECOND CLAIM**
**Against Individual Defendants for Breach of Fiduciary Duties**

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Riot's business and affairs.

177.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Riot.

179.    In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

180.    In further breach of their fiduciary duties, the Individual Defendants engaged in and/or permitted the Pump-and-Dump Scheme.

181.    Also in breach of their fiduciary duties owed to Riot, the Individual Defendants willfully or recklessly caused the Company to issue false and misleading statements and omit material facts to the detriment of the shareholders and the Company, failing to disclose that: (1) the Pump-and-Dump Scheme was occurring; (2) Riot in reality had limited meaningful

investments in cryptocurrency products; (3) the Company did not have a meaningful cryptocurrency business plan; (4) Defendants O'Rourke and Honig have a history of financial dealings and joining in investments and regularly consulted regarding Riot's business and affairs; (5) the Company's principal executive offices were not in Colorado as stated by the Company, but instead in Florida in the same location as Defendant Honig; (6) Defendant Honig effectively controlled and/or exercised undue influence over Riot and its operations and affairs; (7) the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (8) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

182.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

183.    Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to timely correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

184.    The Individual Defendants also breached their fiduciary duties by failing to cause the Company to timely hold an annual meeting, thereby depriving Riot shareholders of their fundamental rights and entrenching the members of the Board.

185.    Moreover, the Individual Defendants breached their fiduciary duties by causing and/or permitting the Company to pay an improper dividend.

186.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Riot's securities and disguising insider sales.

187.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Riot's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

188.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

189.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Riot has sustained and continues to sustain significant damages.

190.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.     Plaintiff on behalf of Riot has no adequate remedy at law.

### THIRD CLAIM
**Against Individual Defendants for Unjust Enrichment**

192.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Riot.

194.     The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Riot that was tied to the performance or artificially inflated valuation of Riot, or received compensation and/or a dividend that was unjust in light of the Individual Defendants' bad faith conduct.

195.     Plaintiff, as a shareholder and a representative of Riot, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

196.     Plaintiff on behalf of Riot has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

199.    The Individual Defendants also caused the Company to pay a dividend that further depleted Riot's already low cash reserves.

200.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Riot to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

201.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

202.    Plaintiff on behalf of Riot has no adequate remedy at law.

## FIFTH CLAIM
### Against Defendant Honig for Aiding and Abetting
### the Remaining Individual Defendants' Misconduct

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    In the event Defendant Honig is not found to owe a fiduciary duty to the Company and its shareholders, Defendant Honig aided and abetted the remaining Individual Defendants who breached their fiduciary duty to Riot.

205.   Defendant Honig's misconduct resulted in continuous, connected, and on-going harm to the Company.

206.   Specifically, Defendant Honig was materially involved in the operations and business of Riot.  Defendant Honig aided and abetted the misconduct discussed herein to reap personal financial benefit.

207.   Defendant Honig is jointly and severally liable the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

208.   As a direct and proximate result of Defendant Honig's aiding and abetting of Riot's directors' and officers' breaches of duty and other misconduct alleged herein, Riot has sustained and will continue to sustain substantial damages.

209.   Plaintiff on behalf of Riot has no adequate remedy at law.

### REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Riot, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached, and/or aided and abetted the breach of, fiduciary duties to Riot;

(c)   Determining and awarding to Riot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Riot and the Individual Defendants to take all necessary actions

to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Riot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Riot to nominate at least two candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Riot restitution from the Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2018                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim
275 Madison Avenue, 34th Floor

New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Edward Monts  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of November 2018.

<u>Edward Monts</u>
Edward Monts